ERIKA BIRCH (Bar No.7831)
ERIK STRINDBERG (Bar No. 8905)
**STRINDBERG & SCHOLNICK, LLC**
802 W. BANNOCK STREET, SUITE 308
BOISE, ID 83702
(t) 208.336.1788
(f) 208.344.7980
erika@idahojobjustice.com
erik@utahjobjustice.com

Attorneys for Plaintiff

===============================================================

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **DOUG STROSNIDER,**<br><br>        Plaintiff,<br><br>vs.<br><br>**CITY OF NAMPA, a municipality, BOB HENRY, in both his official and individual capacities, and KARL MALOTT, in his official and individual capacity,**<br><br>        Defendants. | **COMPLAINT**<br>**(JURY DEMANDED)**<br><br><br>Civil No.   1:14-cv-459<br><br>Judge _____ |

Plaintiff Doug Strosnider ("Mr. Strosnider"), by and through his attorneys, hereby

complains against Defendants City of Nampa ("Nampa"); Bob Henry, Mayor of Nampa; and

Karl Malott, Chief of the Nampa Fire Department, (collectively "Defendants") as follows:

## I.     NATURE OF THE CLAIMS

1.      This suit is brought by a former employee of the Defendants under 42 U.S.C. § 1983 ("§ 1983") for deprivation of both his property interest in his employment with the Nampa Fire Department and his liberty interest without due process of law, and for retaliation in exercising his free speech rights. In addition, Plaintiff brings a claim for retaliation for reporting violations of the Fair Housing Act, in violation of 42 U.S.C. § 3604 and 3617. Also pled are pendant state law claims, specifically violation of the Idaho Whistleblower Act, I.C. § 6-2101 and breach of contract/good faith and fair dealing clause.

2.      Plaintiff seeks all available remedies including equitable relief, damages, attorneys' fees, costs, and interest.

## PARTIES

3.      Defendant Nampa is a city in Idaho, duly organized pursuant to state law, Idaho Code Section 6-2103.

4.      Defendant Bob Henry ("Mayor Henry" or "Mayor") is believed to be a resident of Nampa, and at all times relevant to the claims raised herein was the duly elected Mayor of Nampa. He is being sued in both his official capacity and in his individual capacity.

5.      Defendant Karl Malott ("Chief Malott") at all times relevant hereto was the Chief of the Nampa Fire Department and was Mr. Strosnider's immediate supervisor. He is being sued in both his official capacity and in his individual capacity.

6.       Plaintiff Doug Strosnider ("Mr. Strosnider") is a resident of Nampa, Idaho, and had been a Deputy Chief with the Nampa City Fire Department until he was wrongfully fired in May of 2014**.**

**JURISDICITION AND VENUE**

7.     This Court has original jurisdiction under the provisions of 28 U.S.C. § 1331 with respect to Plaintiff's claims arising under federal law. This Court has concurrent jurisdiction over Plaintiff's state law claims under the provisions of 28 U.S.C. § 1367.

8.     Venue is proper with this Court as Defendant Nampa is a city located in Idaho, Mr. Henry and Mr. Malott work and reside in the district, and the alleged illegal conduct occurred within the jurisdiction of this Court.

**GENERAL ALLEGATIONS**

9.     Mr. Strosnider was hired by the Nampa Fire Department ("Fire Department" or "Department") in 1992.

10.     In 1997 Mr. Strosnider tested for and was promoted to the position of Deputy Chief of Prevention/Fire Marshal. He held that position for approximately the next 12 years.

11.     In 2009, Mr. Strosnider was laterally transferred and became the Deputy Chief of Operations.

12.     He served in that position until January 1, 2014.

13.     At that time, Chief Malott assigned Mr. Strosnider to again serve as the Deputy Chief/Fire Marshal over the Fire Prevention Bureau ("Bureau").

14.     The Bureau is responsible for enforcement of the fire code, inspection of new and existing construction, approval of fire alarm and sprinkler plans, fire investigations, and duties related thereto.

15.     Prior to Mr. Strosnider's transfer back to the Bureau, three of the four Deputy Fire Marshals ("DFM") worked Monday through Thursday so many times coverage on Fridays was inadequate.

16.     Prior to assuming the Fire Marshal position, Chief Malott instructed Mr. Strosnider to rearrange the schedules of the four DFMs so that there would be coverage Monday through Friday.

17.     Shortly after assuming his new duties, Mr. Strosnider met with his staff to discuss the changes he wanted to implement, both in schedules and assignments.

18.     Mr. Strosnider also informed Defendant Chief Malott of the proposed changes and he approved them.

19.     All of the changes Mr. Strosnider made were done so that the Bureau would operate more efficiently and effectively

20.     Even before he transferred back into the Fire Marshal position, Mr. Strosnider expressed his concerns about two apartment buildings in Nampa: Golden Glow and Landmark Towers. He had become concerned about these apartments because he observed that many residents had aged to a point that mobility was becoming an issue and/or had physical disabilities.

21.     As a result, Mr. Strosnider believed that some of the residents would be unable to self-evacuate from the buildings, or would have great difficulty doing so, in the event of a fire or other disaster.

22.     Mr. Strosnider's concerns were well founded as some years earlier two fires had occurred at Golden Glow and one fire at Landmark Tower.

23.     One of these fires, in 2004, resulted in seven individuals having to be transported to the hospital for treatment due to smoke inhalation.

COMPLAINT AND DEMAND FOR JURY TRIAL - 4

24.     In addition, repeated inspections over several years had shown that the fire alarm system was not being maintained or operating properly, that the fire pump was not being maintained and other deficiencies in the life safety systems.

25.     Based on this history of prior inspections and problems, Mr. Strosnider knew that Golden Glow Towers lacked a functional fire alarm system and had no fire sprinklers, and that Landmark Towers lacked fire sprinklers in occupants' rooms.

26.     In order to comply with fire codes, and also as necessary as life-saving measures, Mr. Strosnider knew that both fire alarm and fire sprinkler systems needed to be in and functional throughout both apartment buildings.

27.     In early January DFM Edwards met with the representatives from the Golden Glow to discuss the fire alarm and sprinkler system issues and to inspect the life safety equipment.

28.     DFM Edwards' notes indicate that he met with them on January 3, 2014, at which time he found that the fire alarm system was "very old and malfunctioning."

29.     DFM Edwards also noted that the building lacked a fire sprinkler system.

30.     DFM Edwards reported these ongoing problems to Mr. Strosnider who directed DFM Edwards to have a follow up meeting with Golden Glow the next month.

31.     Mr. Strosnider also assigned DFM Melissa Close to inspect the Landmark Tower building. Her inspection confirmed the lack of a fire sprinkler system throughout the sleeping rooms, although the building, unlike Golden Glow, did have a functioning alarm system.

32.     DFM Edwards' follow up inspection/meeting at Golden Glow occurred on February 5, 2014.

33.    At that second meeting, according to DFM Edwards' notes, Golden Glow contended that it did not provide custodial care for any of its occupants because they were all "ambulatory, mentally competent, self-sufficient and capable of self preservation."

34.    Golden Glow also informed DFM Edwards that anyone who was totally blind or totally deaf was not allowed to live in the building.

35.    Even though two fires had already occurred in the building, Golden Glow argued that there was nothing in the building that could burn because it was concrete.

36.    DFM Edwards reported what he had been told by Golden Glow to Mr. Strosnider and also entered this information from his notes into a computerized file system.

37.    In Mr. Strosnider's opinion as the fire code official, these two apartment buildings constituted a distinct hazard to life and property as referred to the International Fire Code as adopted by the State of Idaho.  The inspections reinforced the need for substantial upgrades to the fire alarm and fire sprinkler system in Golden Glow and the need for a complete fire sprinkler system at Landmark Tower.

38.     Mr. Strosnider was also concerned about Golden Glow's representations that it would not allow disabled residents to live in the building.

39.    Accordingly, on or about February 26, 2014, Mr. Strosnider met with Defendant Mayor Henry to discuss fire code compliance at the two buildings. Vicki Holbrook, the communications director for Nampa was also present.

40.    Mr. Strosnider informed Mayor Henry that he intended to issue a Notice and Order ("Notice") for both buildings requiring them to have fire alarm and sprinkler systems in place.

41.     A Notice and Order is a document that is issued by the Bureau to notify an owner of non-compliance with the fire code and giving the owner direction on what needs to be done to come into compliance.

42.     Mayor Henry stated that he did not like the idea of sending out such Notices, but he did not forbid Mr. Strosnider from having the Notices served.

43.     The next day Mr. Strosnider sent an email and an article to Ms. Holbrook further explaining the life and safety issues that were raised by the conditions at the Golden Glow and Landmark buildings.

44.     Ms. Holbrook responded that she understood his concerns but indicated that she "understood the other side" and indicated that Mayor Henry would be talking with the Fire Chief, Defendant Malott, to discuss the issue.

45.     Ms. Holbrook also said that she felt the Mayor did not like the idea of sending out the Notices.

46.     A few days later, on March 4, all six chief officers in the Fire Department attended a Battalion Chief meeting. Both Mr. Strosnider and Defendant Chief Malott were present.

47.     During this meeting Mr. Strosnider raised Golden Glow's and Landmark Towers' lack of compliance with the fire code and the life safety issues.

48.     In the course of this discussion, Defendant Chief Malott acknowledged that the buildings presented a serious danger and pointed out that many of the residents' decks were festooned with combustible materials which could easily cause a fire to engulf the entirety of the buildings' exteriors.

49.     Others, like Battalion Chief Leighton, also raised safety concerns and asked what was being done to bring the buildings into compliance.

50.     Mr. Strosnider explained that Notice and Orders would be sent out shortly.

51.     Shortly after that meeting, Mr. Strosnider asked DFM Edwards to draft a Notice for Golden Glow and DFM Close to draft a Notice for Landmark Towers.

52.     The Notice to Golden Glow required it to change its fire alarm and install a fire sprinkler system.

53.     The Notice to Landmark required it to install a complete fire sprinkler system.

54.     Mr. Strosnider kept Defendant Chief Malott fully informed of what actions he was taking including that he intended to send the Notices.

55.     Having had no direction to the contrary, Mr. Strosnider signed and sent out the Notices around the middle of March.

56.     Because of his concern about possible discrimination against disabled individuals, in addition to the life safety issues, Mr. Strosnider contacted two disability rights groups/agencies.

57.     One of the agencies that Mr. Strosnider contacted was the Northwest ADA Center-Idaho, which he called on or about March 10, 2014, and talked with Dana Gover.

58.     Mr.  Strosnider explained to Ms. Gover that he had major safety and life concerns about Golden Glow and Landmark Towers in Nampa because the buildings had fire sprinkler problems, no plans for evacuation, no area of rescue, and at Golden Glow, the malfunctioning fire alarm could not be heard in many of the apartments.

59.     Mr. Strosnider then relayed what had been told to DFM Edwards by Golden Glow – it did not rent to people in wheelchairs as they had to be able to evacuate on their own, and that he was concerned that this was discriminatory and illegal.

60.     Mr. Strosnider then asked if someone could verify if in fact Golden Glow excluded disabled renters.

COMPLAINT AND DEMAND FOR JURY TRIAL - 8

61.     Finally, Mr. Strosnider asked if property managers could legally require non-ambulatory tenants to live on the first floor so they could be evacuated safely as a temporary measure until the fire alarm and sprinkler systems were in place.

62.     Ms. Gover at the Northwest ADA Center later contacted the Intermountain Fair Housing Counsel and relayed the conversation she had with Mr. Strosnider.

63.     The Intermountain Fair Housing Council ("IFHC") is a nonprofit organization that promotes fair housing practices in Idaho, and monitors compliance with the Fair Housing Act, which prohibits discrimination in housing, including discrimination based on disability.

64.     In 2013, IFHC brought a lawsuit against Golden Glow for violating the fair housing laws.

65.     Based on information and belief, during this same March time period Mayor Henry was holding one or more meetings with Defendant Chief Malott to discuss the Notices that Mr. Strosnider had issued to Golden Glow and Landmark.

66.     At one point, the Mayor, or his assistant, contacted the administrative assistant in the Fire Department to obtain copies of the Notices sent by Mr. Strosnider.

67.     On or about March 21, 2014, Carrie House from the IFHC contacted Mr. Strosnider to follow up on the information IFHC had received from Ms. Gover at Northwest ADA Center.

68.     Mr. Strosnider relayed to Ms. House the information that DFM Edwards had learned during his meetings with Golden Glow including that they "don't take anyone who is handicapped."

69.     Mr. Strosnider also explained that if there was a fire at Golden Glow the "[Nampa Fire Department] cannot possibly get everyone out, they will perish.  We just do not have the man power."

COMPLAINT AND DEMAND FOR JURY TRIAL - 9

70.     Mr. Strosnider informed Ms. House that he was providing second hand information and she needed to speak directly with DFM Edwards as he had conducted the inspections at Golden Glow and had spoken directly with the owner/manager.

71.     During the next week Ms. House placed several phone calls to DFM Edwards but he did not return her calls.

72.     On or about March 27, 2014, Ms. House re-contacted Mr. Strosnider and asked if he could get DFM Edwards to return her call, which he did.

73.     In the meantime, on March 31, 2014, Defendant Chief Malott sent copies of the Notice that had been sent to Golden Glow and the inspection notes to Deputy Chief ("DC") Richard Davies.

74.     DC Davies had been the Fire Marshal until he was replaced by Mr. Strosnider on January 1, 2014. DC Davies was then transferred to Operations.

75.     As head of Operations, DC Davies had nothing whatsoever to do with the Bureau.

76.     On April 1, 2014, Defendant Chief Malott called Mr. Strosnider into his office.

77.     Defendant Chief Malott's attitude about the need for the safety upgrades to the two buildings had changed significantly. He told Mr. Strosnider, for the first time, that he felt the Department was on "shaky" grounds in sending out the notices to Golden Glow and Landmark Towers.

78.     Defendant Chief Malott also claimed the Notices were deficient because they did not contain information regarding the appeals process.

79.     Defendant Chief Malott then directed Mr. Strosnider to create a policy that could be followed any time the department was going to issue a "Notice and Order."

80.     Mr. Strosnider apologized for the deficiencies, and after returning to his office immediately contacted the Owners/Managers of both complexes to inform them of their right to appeal. He also told them that written information regarding the appeal process would be sent to them. Mr. Strosnider informed Defendant Chief Malott about these conversations on April 1st.

81.     The following afternoon, April 2, 2014, Defendant Chief Malott sent Mr. Strosnider an email directing him to "not have any further conversations with representatives of either Golden Glow or Landmark."

82.     After being directed by Mr. Strosnider to return her call, DFM Edwards talked with Ms. House at IFHC on April 3rd.

83.     DFM Edwards stated that Golden Glow made sure that its residents were ambulatory, although there was one resident in a motorized wheelchair.

84.     Upon information and belief, DFM Edwards also told Ms. House that he had taken notes during his meetings with Golden Glow, and indicated that he would provide them to her.

85.     On April 9, 2014, Ms. House still had not received the notes taken by DFM Edwards and called Mr. Strosnider to ask if he could have the notes sent to her.

86.     Mr. Strosnider then contacted DFM Edwards and directed him to send his notes from the January and February inspections at Golden Glow to Ms. House.

87.     Later that day DFM Edwards faxed his notes to Ms. House.

88.     In addition to the notes he had taken at the inspections, DFM Edwards added the following narrative:

> Below are two narratives from my daily; activity report logs about visit and conversations with Stan Olson and Marie Nelson at Golden Glow Tower.  Not included in those narratives is my recollection of further conversations where Stan Olson stated; that the occupants are checked and evaluated to make sure they are mentally capable of recognizing or escaping danger, and physically able to descend down the fire escape stairs. Stan stated that if they could not get their way

out in an emergency, they would not be allowed to live there. Stan further stated;
"that I need not worry, that all his occupants could descend down the stairs and
get out if they needed to."

89.    On information and belief, DFM Edwards then went to DC Davies to explain that he had

been directed by Mr. Strosnider to contact the IFHC and to send his inspection notes Ms. House.

90.    DC Davies told DFM Edwards to call the City Attorney to explain what had occurred vis-

à-vis Golden Glow and IFHC.

91.    DFM Edwards then talked with the City attorney who told him that he needed to have a

public record request before releasing any information.

92.    On April 10th, the day after sending his notes and comments to IFHC, DFM Edwards

contacted Ms. House and told her that she should have sent in a public record request and asked

her to destroy his faxed notes sent the previous day.

93.    DFM Edwards told Ms. House that he would be in trouble if she did not destroy the

notes.

94.    Ms. House did not destroy the notes, but did send DFM Edwards a public record request

that same day, April 10, 2014.

95.    In her email Ms. House indicated that

   [Mr. Strosnider] contacted multiple disability rights agencies regarding a
   potential issue regarding Golden Glow tower. They then requested that we contact
   [Mr. Strosnider] to investigate the matters. I spoke to [Mr. Strosnider] twice and
   he suggested that I contact you to get the report for that incident as to what was
   said about the residents at their complex…

96.    Ms. House's request concluded by asking DFM Edwards to send her all of his case notes.

97.    DFM Edwards responded to the request by emailing his case notes to Ms. House.

98.    However, DFM Edwards altered what he had previously sent Ms. House by deleting any

reference to comments that Golden Glow's residents had to be mentally capable of recognizing

COMPLAINT AND DEMAND FOR JURY TRIAL - 12

danger and able to get down the stairs on their own, otherwise Golden Glow would not rent to them.

99.     Based on the information it received from Mr. Strosnider and from DFM Edwards, after he was directed to contact it, IFHC complained about Golden Glow's discriminatory conduct towards disabled individuals to the HUD office in Seattle.

100.    On April 11th DFM Edwards met with Tina Combs in the Nampa City HR department.

101.    DFM Edwards told her that he was being "set-up by DC Strosnider," and that the "Golden Tower issue was ordered by DC Strosnider."

102.    He also told Ms. Combs that "DC Strosnider had contacted HUD, Health & Welfare, and Human Services . . . about the conversation Reggie had, had [sic] with Stan Olson"

103.    Although DFM Edwards initially told Ms. Combs that he could not recall his conversation with Stan Olson at Golden Glow, he later relayed the following information as reflected in Ms. Combs' notes:

> Stan Olson told Reggie they don't let the blind, totally disabled people in because they want the clientele [sic] to be able to go up and down the stairs, etc. DC Strosnider had order Reggie to call the agency to explain and tell them about the conversation that had taken place between Reggie and Stan Olson. Reggie obliged with the command, but felt something was terribly wrong.

104.    DFM Edwards concluded the interview with Ms. Combs by saying that he felt he was being "harassed" by Mr. Strosnider.

105.    That same day Defendant Chief Malott called Mr. Strosnider into his office and handed him a "Letter of Reprimand, Suspension, and Corrective Action."

106.    The letter indicated that by sending out the Notice and Orders to Golden Glow and Landmark, Mr. Strosnider had "showed poor judgment by placing the Department, the City, and the Fire Chief in a volatile situation."

107.    The letter also confirmed that Defendant Chief Malott told Mr. Strosnider that he planned to rescind both Notices.

108.    The letter suspended Mr. Strosnider without pay for the period April 14 through April 25 and placed him on probation until September 15, 2014.

109.    Defendant Chief Malott concluded the suspension letter by stating that "in both of these instances [sending the Notices] the outcomes were very predictable and, someone with your experience should have been able to predict the reactions and make a different decision."

110.    Defendant Chief Malott wrote in his letter of discipline to Mr. Strosnider that " Although I understand you believe your actions were warranted due to your concern for the safety of residents we need to keep in mind the rights of property owners."

111.    On April 17, 2014, DFM Edwards forwarded to DC Davies the email he had received from Ms. House on April 10, which started with "[Mr. Strosnider] contacted multiple disability rights agencies regarding a potential issue regarding Golden Glow Tower."

112.    The next day DC Davies stopped by to see Tina Combs in HR "to tell [her] about the incident that occurred with Reggie and the Golden Towers incident regarding the email and DC Strosnider ordering Reggie Edwards to give the agency the information."

113.    DC Davies also told Ms. Combs that "he concurred with all the events Reggie had described."

114.    Mr. Strosnider returned to work after his two week unpaid suspension on Monday, April 28, 2014 and reported to Defendant Chief Malott's office at 8:00 a.m. Defendant Chief Malott was not in his office.

115.    Sometime before 9:00 a.m., Defendant Chief Malott arrived and called Mr. Strosnider into his office.  He told Mr. Strosnider that he was late because he had just finished meeting with Director of Human Resources Ed Simmerman.

116.    Upon information and belief, Mr. Simmerman told Defendant Malott about DFM Edwards' complaint that he was being "harassed" by being forced to communicate with IFHC and the other information Ms. Combs had received.

117.    Defendant Chief Malott told Mr. Strosnider that he was being placed on administrative leave effective immediately.

118.    Mr. Strosnider asked him why he was being placed on leave as he had just returned from his suspension and had not yet done any substantive work.

119.    Defendant Chief Malott replied "I won't tell you."

120.    Four days later, on May 2, 2014, Defendant Chief Malott served Mr. Strosnider with a letter terminating his employment.

121.    On information and belief, it is alleged that either Mayor Henry made the decision to terminate Mr. Strosnider's employment, took part in the decision, or approved of the decision.

122.    The termination letter cited a number of alleged reasons for the termination, none of which were true or accurate.

123.    The termination letter also referenced Mr. Strosnider's actions in regard to Golden Glow and Landmark Tower:

> Furthermore, you [sic] actions have demonstrated a lack of good judgment which,
> paired with your actions on the Landmark Towers and Golden Glow buildings,
> have caused me, as your supervisor, to lose confidence in you and you [sic] ability
> to serve in a leadership role.

124.    The termination letter also stated that Mr. Strosnider might be entitled to a "Name Clearing" hearing which would be limited to a meeting with the Mayor lasting no more than two hours.

125.    Mr. Strosnider, through his attorneys, timely requested a hearing.

126.    Mr. Strosnider objected to the form of the "hearing" - a meeting with the Mayor - and requested that he be granted a "full and fair hearing, before a neutral hearing officer or body, where he is given the opportunity to present evidence and witnesses, and confront the evidence and witnesses against him."

127.    The City, through its attorney, responded that Mr. Strosnider was entitled only to meet with the Mayor.

128.    Mr. Strosnider responded that under well established case law he was entitled to a full and fair hearing and that a meeting with the Mayor was not adequate.

129.    Mr. Strosnider also pointed out that the Mayor was not neutral and that he intended on calling him as a witness, if given a constitutionally adequate hearing.

130.    In subsequent communications, Mr. Strosnider also pointed out that he was entitled to more than a "name-clearing hearing" as he had a property interest in his employment.

131.    The City disputed that Mr. Strosnider had a property interest in his employment, and chose not to give Mr. Strosnider a hearing.

132.    The City reiterated that Mr. Strosnider was only entitled to meet with the Mayor and was not entitled to call witnesses or otherwise present evidence.

133.    The meeting with the Mayor occurred on June 30, 2014.

134.    On July 1, 2014, the Mayor issued a "decision" which said that he was directing City of Nampa officials not to disclose to anyone the substance of the suspension and termination letters.

135.    The Mayor's "decision" did not even discuss whether Mr. Strosnider's termination was proper or should be overturned.

136.    Accordingly, Mr. Strosnider's employment with the City of Nampa was not reinstated.

137.    In the meantime, six days earlier, June 25, 2014, HUD had sent a notice to Golden Glow indicating that it was investigating the complaint filed by IFHC.

138.    After receiving the notice from HUD, it is believed that Golden Glow contacted Nampa City and/or the Fire Department to report it had been served with a HUD complaint

139.    On July 8, 2014, DFM Edwards met and consulted with Golden Glow about the "alleged complaint of discriminatory practices."

140.    It is believed that DFM Edwards was then instructed to write a letter to HUD asking it to dismiss the charge against Golden Glow.

141.    This letter was reviewed and approved both by Defendant Chief Malott and by DC Davies, who had assumed command over the Bureau after Mr. Strosnider was fired.

142.    DFM Edwards' letter starts out as follows:

> It appears that a formal complaint alleging discriminatory housing practices at Golden Glow Tower . . . was initiated by the Nampa Fire Prevention Bureau, specifically by phone conversation from Deputy Chief Doug Strosnider.  Mr. Strosnider used my narrative notes from our daily activity reports to make this claim.  He then directed me to pass on specific notes to Carrie House, Intermountain Fair Housing Council.  Ms. House told me that Mr. Strosnider contacted numerous human rights agencies to initiate this complaint.

143.    DFM Edwards also tried to negate what he was told by Stan Olson at Golden Glow by claiming "[w]e agreed up front that some of his answers to my questions may be inaccurate, but he would do his best."

144.    The letter goes on to state:

COMPLAINT AND DEMAND FOR JURY TRIAL - 17

I cannot explain why Deputy Chief Strosnider reported 'alleged' claims of discrimination.  I can only speculate at this time.  I did not request him to do this. .
.

145.     On or about July 14, 2014, Mr. Strosnider served a Notice of Claim on the City, the Mayor and Chief Malott, pursuant to I.C. §6-907, §6-908, and §50-219.

146.     Neither the City, nor the Mayor or Defendant Chief Malott has responded to the Notice of Claim.

147.     Mr. Strosnider has diligently attempted to find equivalent employment with another fire department but currently remains unemployed.

148.     When asked by any potential employer why he is no longer at Nampa City, he has no choice but to answer honestly that he was fired.

## FIRST CLAIM FOR RELIEF
### (Retaliation under the Fair Housing Act against all Defendants)

149.     Mr. Strosnider alleges and incorporates by reference all of the paragraphs and allegations set forth above.

150.     As set forth above, Mr. Strosnider became aware of, and concerned with, Golden Glow's statements suggesting that it did not or would not rent to disabled individuals.

151.     Such conduct violates 42 U.S.C. § 3604(f) and (c) of the Fair Housing Act.

152.     Mr. Strosnider reported his concerns to the Northwest ADA Center, and also subsequently spoke on at least two occasions with IFHC about these concerns.

153.     Mr. Strosnider also directed his subordinate, DFM Edwards, to speak with IFHC and to turn over documentation about the discriminatory conduct occurring at Golden Glow.

154.     Mr. Strosnider's actions were an attempt to aid or encourage disabled persons in the exercise or enjoyment of rights granted or protected by Section 3604.

155.    Defendants became aware of Mr. Strosnider's protected activity, including that "[Mr. Strosnider] contacted multiple disability rights agencies regarding a potential issue regarding Golden Glow Tower."

156.    Defendants suspended and then terminated Mr. Strosnider based in whole or in part on his protected activity.

157.    Defendants' actions violated 42 U.S.C. § 3617:

>    It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of having exercised or enjoyed, or on account of his having aided or encouraged any other person in their exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605 or 3606 of this title.

158.    Defendants' illegal conduct has seriously injured Mr. Strosnider and he is entitled to all available relief, including injunctive relief, back pay, reinstatement, and actual, compensatory damages, as well as costs and attorney fees.

159.    Defendants conduct was willful and intentional and exhibits reckless or callous indifference for the rights secured by the Fair Housing Act, entitling Mr. Strosnider to punitive damages.

## SECOND CLAIM FOR RELIEF
### (Deprivation of Mr. Strosnider's Property Interest without Due Process in Violation of 42 U.S.C. § 1983 against all Defendants)

160.    Mr. Strosnider alleges and incorporates by reference all of the paragraphs and allegations set forth above.

161.    The City of Nampa's ordinances provide that its employees, unless excluded, shall be "recruited, selected, advanced, retained and separated on a competitive comparison of their relative ability knowledge, skills and work performance." Mr. Strosnider's position is not excluded from this merit system. Nampa City Code §2-5-1 & §2-5-2.

162.    The City updated its Employee Handbook effective September 1, 2012 stating that "employment with the City is 'at-will.'" This provision is contrary to Nampa City Code's merit system and is therefore void.

163.    Additionally, the Nampa Fire Department has adopted and published rules which it refers to as "Working Rules and Regulations of the Nampa Fire Department" ("Rules').

164.    A copy of those Rules was distributed to all members of the Fire Department including Mr. Strosnider.

165.    The Disciplinary Action portion of the Rules, section 2, states:

> Dismissals discharges or separations are for delinquency, misconduct, inefficiency, or inability to perform work of the position. Examples of cause for dismissal are contai8ned [sic] within these Rules and regulations.

166.    Section 7 of the Disciplinary rules, thereafter sets out a list of "reasons which might be cause for disciplinary action."

167.    These Rules also specify job duties of the Deputy Chief/Fire Marshal.

168.    These Rules do not contain a contract disclaimer.

169.    These Rules do not have discretionary language warning that they can be changed at any time.

170.    These Rules have no mention of "at-will" employment.

171.    In December of 2013, Defendant Chief Malott also issued Policy No. 1000 titled "Disciplinary Policy."

172.    Policy 1000 provides that discipline is to be applied equitably, that each incident must be investigated and that each incident must be judged on its own merits.

173.    Policy 1000 also provides that the level of discipline must be based on a review of six separate factors, confirms that the Department "believes in the concept of progressive discipline," and that only serious misconduct justifies termination on the first offense.

174.    Additionally, Article 5 – Section 1 – titled Management Rights – of the contract between the City and the Local Union specifically provides that "[t]he City reserves the right to discipline or discharge for just cause."

175.    There is no language in Article 5 which limits this provision to union members.

176.    Based on these Ordinances, Rules, policies, and contractual provisions, Mr. Strosnider had a reasonable expectation and a legitimate claim of entitlement to continued employment and therefore had a property interest in his employment.

177.    Denying Mr. Strosnider both a pre-termination hearing and a full and fair post-termination hearing, Defendant's termination of Mr. Strosnider violated his rights to due process of law under the United States Constitution.

178.    The post-termination "hearing" was not constitutionally adequate and was not before a neutral decision maker.

179.    At all times relevant hereto, Defendants acted under color of state law when committing the acts complained of.

180.    Defendants Chief Malott and the Mayor had final policy making authority and exercised that authority in termination Plaintiff.

181.    Defendants' actions violated Mr. Strosnider's rights under the Fourteenth Amendment to the U.S. Constitution.

182.    Defendants' conduct violated the clearly established constitutional right to due process of which a reasonable person would have known.

183.    Mr. Strosnider has been injured by Defendants' conduct and has suffered and will

continue to suffer losses. Pursuant to 42 U.S.C. § 1983 he is entitled to all available relief,

including injunctive relief, back pay, reinstatement and/or front pay, and actual and

compensatory damages, as well as costs and attorney fees.

184.    The individual Defendants' conduct was willful and intentional, malicious, and exhibits

reckless or callous indifference to Mr. Strosnider's constitutional rights thereby entitling him to

punitive damages.

**THIRD CLAIM FOR RELIEF**
**(Deprivation of Mr. Strosnider's Liberty Interest without Due Process in Violation of 42 U.S.C. § 1983 against all Defendants)**

185.    Mr. Strosnider alleges and incorporates by reference all of the paragraphs and allegations

set forth above.

186.    In addition to his property interest in his employment, Mr. Strosnider also had a liberty

interest in both his good name, and reputation, and in continued and future employment.

187.    Defendants infringed upon those liberty interests by impugning the good name, honor,

and integrity of Mr. Strosnider by terminating his employment based on allegations that he had

illegally altered documents, interfered with City government, harassed an employee, and lied to

the Chief.

188.    The Defendants acknowledged that the charges it had made against Mr. Strosnider in

conjunction with his termination were stigmatizing by allowing him to have what the Defendants

referred to as a Name Clearing Hearing.

189.    Defendants' allegations against Mr. Strosnider are part of his personnel file and at least

some of them have been made known to individuals and organizations outside of the City.

Therefore, these false allegations impose a stigma on his professional reputation.

190.    As a result of Defendants' wrongful conduct, Mr. Strosnider's professional reputation has been adversely impacted and it has foreclosed other employment opportunities, effectively black-listing him from gaining ongoing employment in his field again.

191.    As set forth above, Defendant chose to violate Mr. Strosnider's due process right, by not providing him with a pre-termination hearing or a post-termination hearing that met minimum due process standards.

192.    At all times relevant hereto, Defendants acted under color of state law when committing the acts complained of.

193.    Defendants' conduct violated the clearly established constitutional right to due process of which a reasonable person would have known.

194.    Mr. Strosnider is entitled, pursuant to 42 USC § 1983, to all available relief, including injunctive relief, back pay, reinstatement and/or front pay, and actual and  compensatory damages, as well as costs and attorney fees.

195.    The individual Defendants conduct was willful and intentional, malicious, and exhibits reckless or callous indifference to Mr. Strosnider's constitutional rights thereby entitling him to punitive damages.

## FOURTH CLAIM FOR RELIEF
### (Violation of Mr. Strosnider's Right to Free Speech in Violation of 42 U.S.C. § 1983)

196.    Mr. Strosnider alleges and incorporates by reference all of the paragraphs and allegations set forth above.

197.    As set forth above, Mr. Strosnider contacted the Northwest ADA Center, and then spoke with and provided information to IFHC.

198.    Mr. Strosnider contacted and spoke with these agencies and organizations because he believed that disabled individuals were being discriminated against and was concerned for their health and welfare as residents of Landmark and Golden Glow

199.    In making these contacts and raising concerns with these individuals, Mr. Strosnider was not acting or operating pursuant to his official duties, which had nothing to do with housing discrimination.

200.    The issues that Mr. Strosnider spoke about were without question matters of public concern as they affected the legal rights and safety of disabled residents of Nampa City.

201.    Mr. Strosnider's comments and actions were done in a manner which did not in any way disrupt or negatively impact the Fire Department or the City of Nampa government.

202.    Accordingly Mr. Strosnider's interest in communicating and commenting on these public matters outweigh the interest of the City of Nampa in promoting the efficiency of the public services it provides.

203.    Mr. Strosnider's protected speech was a substantial or motivating factor in the Defendants' decision to first suspend and then terminate his employment.

204.    In doing so, Defendants violated Mr. Strosnider's rights as protected under the First Amendment to the United States Constitution.

205.    Defendants acted under color of law.

206.    Defendants' conduct violated a clearly established constitutional right of free speech of which a reasonable person should have known.

207.    Mr. Strosnider has been injured by Defendants' conduct and has suffered and will continue to suffer losses. Pursuant to 42 U.S.C. § 1983 he is entitled to all available relief,

including injunctive relief, back pay, reinstatement and/or front pay, and actual and

compensatory damages, as well as costs and attorney fees.

208.    The individual Defendants' conduct was willful and intentional, malicious, and exhibits

reckless or callous indifference to Mr. Strosnider's constitutional rights thereby entitling him to

punitive damages.

### FIFTH CLAIM FOR RELIEF
#### (Wrongful Termination in Violation of Idaho Code Section 6-2101, et seq.)

209.    Mr. Strosnider alleges and incorporates by reference all of the paragraphs and allegations

set forth above.

210.    Mr. Strosnider communicated to both the Mayor and Chief Malott that both Golden Glow

and Landmark were violating the state and city fire code by not having adequate fire sprinkler

and alarm systems.

211.    To correct these problems and to safeguard the lives of the residents of these two

facilities he issued Notices ordering the owners to correct the problems.

212.    Mr. Strosnider also communicated to both the Northwest ADA Center and IFHC that

illegal and discriminatory conduct was occurring, or which he reasonably believed was

occurring, at Golden Glow.

213.    These communications were done in good faith and the information was used in an

investigation by IFHC and HUD into possible violations of the Fair Housing Act by the owners

of Golden Glow.

214.    Defendants took adverse action against Mr. Strosnider by suspending him without pay

and then terminating his employment because of his protected activity.

215.    Mr. Strosnider has been injured as result of Defendants' adverse action and he is entitled to injunctive relief, reinstatement, with full fringe benefits and seniority, compensation for lost wages and benefits, and costs and attorneys' fees.

## SIXTH CLAIM FOR RELIEF
### (Breach of Contract/Good Faith Fair Dealing – against the City)

216.    Mr. Strosnider alleges and incorporates by reference all of the paragraphs and allegations set forth above.

217.    The above referenced "Working Rules and Regulations of the Nampa Fire Department" ("Rules"), created a contract between the City and Mr. Strosnider.

218.    Implied in this contract is a covenant of good faith and fair dealing.

219.    These Rules do not contain a contract disclaimer, discretionary language warning that they can be changed at any time, nor do they mention of "at-will" employment.

220.    Instead, these Rules provide that employees will only be fired for cause.

221.    These Rules also state that the City of Nampa Personnel Rules will apply only when these Rules do not apply, *i.e.* these Rules take precedent.

222.    Mr. Strosnider was fired without cause in violation of the contract and the covenant of good faith and fair dealing.

223.    He has suffered damages including lost pay and benefits, and attorneys' fees and costs as a result of Defendant's breach.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendants, and award the following relief.

a.      Back pay, in amounts to be determined at trial;

b.      Compensatory (emotional distress) and consequential damages;

c.      Punitive damages as allowable;

d.      Reinstatement and/or front pay in lieu of reinstatement;

e.      Injunctive and/or declaratory relief;

f.      Pre-judgment and post-judgment interest at the highest lawful rate;

g.      Attorneys' fees and costs of this action, including expert witness fees, as

appropriate; and

h.      Any such further relief as justice allows.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Dated this 28th day of October, 2014.

**STRINDBERG & SCHOLNICK, LLC**

/s/ Erika Birch_____
Attorneys for Plaintiff